NOTICE

Decision filed 01/30/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200121-U

NO. 5-20-0121

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 18-CF-72 |
| | ) | |
| AARON ISAACSON, | ) | Honorable |
| | ) | Jeffery B. Farris, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1  *Held*: The defendant's convictions for possession of a stolen motor vehicle, burglary, and possession of burglary tools are hereby reversed where the State failed to prove an essential element of each charge. We reverse those convictions and remand for a new trial. The defendant's convictions for possession of methamphetamine and possession of drug paraphernalia are affirmed where the defendant was not prejudiced by trial counsel's performance.

¶ 2  This is a direct appeal from the circuit court of Union County. The defendant, Aaron Isaacson, directly appeals his convictions for possession of a stolen motor vehicle, burglary, possession of methamphetamine, possession of burglary tools, and possession of drug paraphernalia. He was convicted by a jury and sentenced to six years' imprisonment to be followed by two years of mandatory supervised released (MSR).[1] For the reasons that follow, we reverse

---

[1]This sentence was to be served consecutively to the sentence in Union County case No. 18-CF-70, which is the subject of the defendant's appeal before this court in *People v. Isaacson*, 2023 IL App (5th) 200120-U.

the defendant's convictions for possession of a stolen motor vehicle, burglary, and possession of burglary tools and remand for a new trial. We affirm the defendant's two remaining convictions for possession of methamphetamine and possession of drug paraphernalia.

¶ 3                                      I. BACKGROUND

¶ 4     The defendant was charged by superseding indictment with the following: (1) unlawful possession of a motor vehicle where the defendant knowingly possessed essential vehicle parts knowing said vehicle parts to be stolen or converted (count I); (2) burglary in that the defendant knowingly and without authority entered a 1997 Honda Accord LX with the intent to commit a theft therein and damaged the vehicle (count II); (3) unlawful possession of methamphetamine where the defendant knowingly possessed 5 or more grams but less than 15 grams of methamphetamine or a substance containing methamphetamine (count III); (4) possession of burglary tools where the defendant knowingly possessed a large pry bar, such item being a tool, instrument, or device suitable for use in breaking into a motor vehicle with the intent to enter into the vehicle and intent to commit a theft in the vehicle (count IV); and (5) unlawful possession of drug paraphernalia where he knowingly and unlawfully possessed an item of drug paraphernalia, being two glass pipes, with the intent to use them to inhale methamphetamine (count V).

¶ 5     On March 9, 2020, the defendant's jury trial began. Crystal Gurley, the owner of Wright's Auto Body and Rod's Towing (Wright's), testified, in 2015, she became the owner of Wright's. The shop had four entrances off Highway 146 West. There was a blue building on the property that was basically used for storage and did not have public access. There was also a body shop, mechanic's shop, a used car lot, a salvage yard, and an impound lot located on the property. The impound lot was fenced in and had secure access, meaning it was normally locked. The salvage yard contained vehicles that were towed and then potentially parted out or sold in the used car lot.

2

The impound lot, on the other hand, was used for police impounds. The vehicles located in front of the body shop and the mechanic's shop by the road belonged to customers that were having their vehicles serviced. The property also contained four rental properties, one of which was being leased to her employee, Stevie Turner. There was a camera security system on the property that consisted of four cameras, one at the front of the body shop that pointed to the salvage yard, one that pointed out towards where the customers' vehicles were parked, one on the corner of the shop that pointed toward the entrances to the shop, and one that pointed to the impound lot. The cameras were activated when motion was detected and recorded to the Cloud.[2]

¶ 6    Gurley testified that, on the night of March 31, 2018, at approximately 11:45 p.m., she called Turner to send him on an after-hours tow. As he was leaving his residence, he drove up the road by the salvage yard when he noticed a man sitting inside a black Honda. Turner called Gurley to tell her someone was on the property. She called the sheriff's office and asked that they check the lot. Her husband also went to the property and met Turner and the officers. The defendant was removed from the property by the officers. She then went back and checked the security footage to determine when and how the defendant had accessed the property. The footage showed that the defendant had arrived on the property at approximately 2:07 p.m., eight hours prior to her becoming aware of his presence on the lot. The video showed the defendant pulling in through the rental property. At that time, there were still employees on the lot, so the defendant backed out of the lot down to the salvage yard. He backed his vehicle in between two rows of cars. The video also showed two employees stop and inspect the car, but there was no one inside at that time.

¶ 7    On April 2, 2018, Gurley received a call from two of her employees whom she had instructed to "write up the bill" on the defendant's Honda. She also asked them to look through

---

[2]The Cloud is an online virtual storage platform.

the windows of the car. They reported to her that there were multiple loose car parts inside the vehicle, some on the floorboards and some in the passenger's seat. Specifically, they noted there were door checks and speakers inside the defendant's vehicle. She then instructed them to go down to the salvage yard to see if they could find a vehicle missing those parts. They reported back to her that there was a gold 1997 Honda Accord that was missing those parts. Subsequently, the defendant's car was moved to the impound lot, which was beside the body shop. The impound lot was a secure area protected by a fence topped with barbed wire and padlocks, which only her employees had access to.

¶ 8    After receiving the report from her employees regarding the condition of the Accord in the salvage lot, Gurley went to inspect the vehicle herself. She observed that the center console was broken, all four interior panels had been damaged, four door checks and four door hinges had been removed, the speakers had been removed, and the headliner had been damaged where the dome light lightbulbs were removed, and the bulbs taken out. She recalled that the week prior, the alternator was sold off the vehicle and that it was not in that condition at that time.

¶ 9    Gurley looked into the defendant's vehicle and saw the door checks, so she called the sheriff's office to file a report. Deputy Josh Schildknecht responded to the call and was accompanied by Agent Asa Busby. She showed them the damaged Accord and then the officers peered into the defendant's vehicle and saw the parts she had reported. At approximately 4 p.m., the officers conducted a search of the defendant's vehicle. She inspected the door checks with Deputy Schildknecht after they were removed from the defendant's vehicle and noted that the door checks were gold, the same color as the Accord located in the salvage lot.

¶ 10   On cross-examination, Gurley admitted that she was unable to identify the driver of the black Honda based solely on the video from March 31. She also admitted that this video was the

4

best video she had of the black Honda arriving that night. Prior to March 31, she recalled that the gold Accord had been on her lot for approximately one year. She had also sold a part from that vehicle—the alternator—a week prior. She admitted that the last time, prior to March 31, that she had personally observed the vehicle was one month before. At that point, the vehicle had been in the impound lot for approximately one year and was moved to the on-site salvage lot. On the morning of April 2, the defendant's vehicle was in the impound lot after being moved there by Turner around midnight on Saturday night and was then driven to the shop. She was present for the search to identify the parts. However, she admitted that none of the recovered parts were taken to the Accord to see if they lined up with its missing parts.

¶ 11    Officer Larry Clover, an officer with the Jonesboro Police Department, testified that he responded to a call reporting a suspicious vehicle at Wright's on March 31, 2018, at approximately 11:45 p.m. Upon arrival, he located the black Honda that was reported and spotted the defendant located inside the vehicle. He instructed the defendant to exit the vehicle and began questioning him. The defendant told him that he knew one of the employees, but Clover informed him that he was trespassing. Clover then asked a Deputy Cody Gwaltney to escort the defendant off the premises.

¶ 12    Next, Clover looked into the defendant's vehicle, noticed it was cluttered, and began photographing its inside contents. He also opened the trunk and noted that it was completely full. He requested an impound for the vehicle, and it was moved to the impound lot on the property. He admitted on cross-examination that the only inventory he did was the taking of the pictures of the interior and the trunk as an itemized inventory would have taken hours, which was also indicated in his report.

¶ 13    Matthew Cole, an employee at Wright's, testified that on March 31, 2018, he was leaving work behind his brother when they noticed a black car that had not been there before. They assumed the car had been towed to the lot the night before. The car was located in the salvage yard. He and his brother both stopped, approached the car, and walked around it. They did not see anyone inside or standing around the vehicle. When Cole arrived to work on April 2, the car had been moved to the impound lot. He was asked by Gurley to go through the salvage yard where the defendant had been for approximately eight hours and look for any missing car parts. He immediately approached the Accord, as he noticed that it had been "messed with." Specifically, he could see that the interior headliner was hanging down. He opened the door to the Accord, and it swung all of the way open. He then observed that three of the door checks were missing. There were also some speakers missing, the light had been pulled down from the headliner, screws were missing, and there were other small damages. He noticed the state of the vehicle on April 2 was different from the week prior, when he removed a starter from the vehicle. He then called Gurley to report to her the state of the Accord.

¶ 14    Cole testified that, with relation to the defendant's car, he had walked around the vehicle and observed the gold door checks lying inside the vehicle, the doors on the black Honda were "rigged up" with ropes to hold them closed, and the door handles were broken. However, he did not testify as to whether he observed the defendant's vehicle before or after he went to the savage yard to look at the Accord. He was working at the body shop at 4 p.m. that day when officers searched the black Honda, and he informed the officers that the speakers found inside the defendant's vehicle would have fit in the gold Accord, which was missing speakers. He also recalled being present when the defendant was arrested and that officers retrieved a dome lightbulb from the defendant's person. He identified the bulb as a dome lightbulb. He knew the part because

6

he himself drove a Honda, and it was the exact same lightbulb. On cross-examination, he admitted that he never inspected whether the parts found in the defendant's vehicle and on his person would have fit in the Accord, nor did he know whether the defendant's vehicle and the Accord used the same dome lightbulb.

¶ 15 Deputy Schildknecht testified that, on April 2, 2018, at approximately 11 a.m., he was on routine patrol when he received a call from Gurley about a possible incident of theft. He arrived at her business with Detective Busby. Gurley informed them that she believed some vehicle parts were stolen off one of the cars in her lot, and they were located inside a different vehicle in the impound lot. The officers first approached the defendant's vehicle in the impound lot and took pictures of its contents. Cole then escorted them to the Accord and pointed out several missing or damaged parts in the Accord. Specifically, there were missing door checks, some door pins, four missing speakers, a damaged headliner, two missing dome lightbulbs, a damaged center console, and damaged door panels. Deputy Schildknecht proceeded to take photographs of the Accord's damage and missing parts.

¶ 16 After inspecting both vehicles, Deputy Schildknecht and Detective Busby returned to the precinct to obtain a search warrant for the defendant's vehicle. During this time, Deputy Schildknecht received a call to return to Wright's because the defendant had returned and attempted to retrieve his vehicle. He went back to Wright's with Detective Busby and arrested the defendant. They searched the defendant incident to arrest and found several small screws and two dome lightbulbs in his pockets.

¶ 17 Deputy Schildknecht went to Wright's a third time that day, had the defendant's vehicle moved from the impound lot to the shop, and carried out the search warrant of the vehicle with Detective Busby. During the search of the vehicle's interior, Deputy Schildknecht had his

7

bodycam turned on. The bodycam footage was played for the jury. He clarified several parts of the video—specifically, the portion that showed that Detective Busby found a white powder that Deputy Schildknecht believed to be either methamphetamine or powder cocaine, as well as a glass pipe he knew to be used to smoke methamphetamine. They also found a "pry bar" or long crowbar in the trunk of the vehicle. He believed the crowbar was possibly a burglary tool because of the other tools found in the main part of the vehicle, including several flashlights, a screwdriver, wire pliers, and an ice pick. On cross-examination, he admitted that he noted that the Accord was a salvage vehicle, it was missing a bumper and tires, and the airbags had been blown out.

¶ 18   Detective Busby testified as to the evidence he found while searching both the defendant and his vehicle. His testimony was substantially the same as Deputy Schildknecht. He accompanied Deputy Schildknecht on all three trips to Wright's, including the defendant's arrest and the search of his vehicle.

¶ 19   Two chain-of-custody witnesses were called, after which the State recalled Gurley. She testified as to the difference between a part number and a serial number and the fact that a part number was not unique to each manufactured part but instead was a stock number issued by the manufacturer. Therefore, a part number could not be matched up to a specific serial number. She testified that the door checks found in the defendant's vehicle were original equipment manufacturer parts that came off the Accord. On cross-examination, however, she admitted that there was no marking to indicate the parts had come from an Accord, and it could potentially have been installed on multiple types of Honda vehicles.

¶ 20   The State rested, the defense moved for directed verdict, which was denied, and the case was given to the jury. The jury found the defendant guilty on all five counts. The defendant was

sentenced to six years' imprisonment followed by two years of MSR to be served consecutively with Union County case No. 18-CF-70. The defendant appeals.

¶ 21                                    II. ANALYSIS

¶ 22    The defendant raises two issues on appeal. First, that his convictions for possession of a stolen motor vehicle, burglary, and possession of burglary tools should be reversed where the State failed to prove his guilt beyond a reasonable doubt. Second, the defendant argues that all five of his convictions should be reversed where he did not receive effective assistance of counsel when counsel failed to object to other-crimes evidence and failed to redact other inadmissible and prejudicial evidence. We agree with the defendant's first argument and therefore reverse and remand for a new trial on those three convictions. The defendant's convictions for possession of methamphetamine and possession of drug paraphernalia are affirmed where he was not prejudiced by counsel's performance at trial.

¶ 23          A. Convictions for Possession of a Stolen Motor Vehicle, Burglary,
                          and Possession of Burglary Tools

¶ 24    As to the defendant's convictions for possession of a stolen motor vehicle, burglary, and possession of burglary tools, the defendant argues on appeal that the State failed to prove the necessary elements of these three charges beyond a reasonable doubt. We agree and reverse the convictions on those three counts and remand for a new trial.

¶ 25    The due process clause of the fourteenth amendment to the United States Constitution requires that a defendant may not be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a reviewing court considers a challenge to the sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

9

doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The *Jackson*

standard applies in all criminal cases, regardless of the nature of the evidence, and "gives full play

to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* This court has

adopted the *Jackson* formulation of the standard of review for claims that the evidence was

insufficient to sustain a conviction, and this court will not retry defendant, nor will we substitute

our judgment for that of the trier of fact. See *People v. Cunningham*, 212 Ill. 2d 274, 278-79

(2004); *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Although this court must allow all reasonable

inferences from the record in favor of the prosecution, we may not allow unreasonable inferences,

even if it favors defendant. *Cunningham*, 212 Ill. 2d at 280.

¶ 26                    1. *Possession of a Stolen Motor Vehicle*

¶ 27    The following is required under the Illinois Vehicle Code in order to convict a defendant

of a felony offense relating to motor vehicles:

> "A person not entitled to the possession of a vehicle or essential part of a vehicle to receive,
> possess, conceal, sell, dispose, or transfer it, knowing it to have been stolen or converted.
> Knowledge that a vehicle or essential part is stolen or converted may be inferred: (A) from
> the surrounding facts and circumstances, which would lead a reasonable person to believe
> that the vehicle or essential part is stolen or converted; or (B) if the person exercises
> exclusive unexplained possession over the stolen or converted vehicle or essential part,
> regardless of whether the date on which the vehicle or essential part was stolen is recent or
> remote[.]" 625 ILCS 5/4-103(a)(1) (West 2020).

¶ 28    Additionally, the vehicle code defines essential parts as:

> "All integral and body parts of a vehicle of a type required to be registered hereunder, the
> removal, alteration or substitution of which would tend to conceal the identity of the vehicle
> or substantially alter its appearance, model, type or mode of operation. 'Essential parts'
> includes the following: vehicle hulks, shells, chassis, frames, front end assemblies (which
> may consist of headlight, grill, fenders and hood), front clip (front end assembly with cowl
> attached), rear clip (which may consist of quarter panels, fenders, floor and top), doors,
> hatchbacks, fenders, cabs, cab clips, cowls, hoods, trunk lids, deck lids, bed, front bumper,
> rear bumper, transmissions, seats, engines, and similar parts. 'Essential parts' also includes

10

fairings, fuel tanks, and forks of motorcycles. 'Essential parts' shall also include stereo radios." *Id.* § 1-118.

¶ 29 Here, there is no evidence that the vehicle parts found either on the defendant's person or in his vehicle belonged to the Accord in the salvage yard. The employees that determined the Accord had been altered were in fact instructed to go through the yard and find a vehicle with the same missing pieces found on the defendant. Although the State pointed to the fact that the paint color of the door checks matched the Accord's paint color, there was conflicting testimony as to the color of the Accord and the color of the door checks, there was no evidence that those door checks were confirmed to have come specifically from the Accord located in the salvage yard as opposed to another Honda vehicle, and the defendant could have been in lawful possession of the door checks since he also owned a Honda vehicle. Additionally, the Accord was a salvage vehicle and was missing several parts other than the door checks and dome lightbulbs, including a missing starter or alternator—Cole and Gurley contradicted each other on this point—and was last observed by staff a week prior to the incident. Lastly, the testimony as to the condition of the Accord and the parts that were salvaged from it was inconsistent and several witnesses outright contradicted one another.

¶ 30 Based on our review of the record, we cannot say that the State presented sufficient evidence, even considering that evidence in the light most favorable to the State, that the car parts found in the defendant's vehicle and on his person belonged to or were removed from the Accord located in the salvage yard. Therefore, we reverse the defendant's conviction for possession of a stolen motor vehicle and remand for a new trial.

¶ 31                                    2. *Burglary*

¶ 32 The offense of burglary is defined under the Criminal Code of 2012 (Code) (720 ILCS 5/19-1(a) (West 2018)) as follows:

11

"A person commits burglary when without authority he or she knowingly enters or without authority remains within a building, housetrailer, watercraft, aircraft, motor vehicle, railroad car, freight container, or any part thereof, with intent to commit therein a felony or theft."

¶ 33   Here, we cannot say that the State presented evidence to establish an unlawful entry for a burglary conviction as required under the Code.  Gurley testified that she did not have video footage of the Accord in the salvage yard.  More importantly, she testified that the video showing the defendant's vehicle entering the property did not show any person leaving the defendant's vehicle or entering another vehicle on the property.  None of the other witnesses testified that they saw the defendant in any other vehicle other than his own, and there was no evidence that any person had in fact entered the Accord.

¶ 34   Based on our review of the record, we find that the State failed to prove an essential element of the offense of burglary, specifically an unlawful entry, and therefore reverse the defendant's conviction for burglary and remand the cause for a new trial.

¶ 35                                3. *Possession of Burglary Tools*

¶ 36   The Code defines the offense of possession of burglary tools as the following:

"A person commits possession of burglary tools when he or she possesses any key, tool, instrument, device, or any explosive, suitable for use in breaking into a building, housetrailer, watercraft, aircraft, motor vehicle, railroad car, or any depository designed for the safekeeping of property, or any part thereof, with intent to enter that place and with intent to commit therein a felony or theft." *Id*. § 19-2(a).

¶ 37   Here, an intent to enter is an essential element of the crime.  The State failed to prove that the defendant ever intended to enter the Accord with the intent to commit a theft.  Not only did the State fail to prove that the defendant ever did in fact enter the Accord, but there was also no evidence that he ever intended to do so.

¶ 38   As for the crowbar found in the defendant's vehicle, it is important to first note that it was Deputy Schildknecht that testified that the defendant appeared to have been living out of his

12

vehicle and that it was packed full of personal items to the point where officers eventually abandoned their search of the vehicle. Additionally, he only concluded that the pry bar was a burglary tool when considered in conjunction with the other tools found in the defendant's car, even though all the other tools were in the main body of the vehicle and the crowbar was in the trunk. We cannot say that this evidence established that the defendant intended to enter the Accord and commit a theft. The mere fact of possessing tools in the vehicle out of which he was living did not establish any intent to enter the Accord.

¶ 39    Because we find that the State failed to prove an essential element of possession of burglary tools, we reverse the defendant's conviction and remand for a new trial.

¶ 40                    B. Ineffective Assistance of Counsel as to All Counts

¶ 41    Claims of ineffective assistance of counsel are resolved under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To establish a claim of ineffective assistance of counsel, a defendant must prove that (1) counsel's representation was deficient, *i.e.*, fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. at 687; *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000). To establish that counsel's performance fell below an objective standard of reasonableness, defendant must overcome the strong presumption that, under the circumstances, the challenged action or inaction was the product of sound trial strategy. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Because effective assistance refers to competent and not perfect representation, mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent. *People v. Moore*, 2012 IL App (1st) 100857, ¶ 43.

13

¶ 42 To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate a reasonable probability that the outcome of the trial would have been different or that the result of the proceeding was unreliable or fundamentally unfair. *Strickland*, 466 U.S. at 687; *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *Moore*, 2012 IL App (1st) 100857, ¶ 44. Such a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because a defendant's failure to satisfy either prong of the *Strickland* test will defeat a claim of ineffective assistance, a court is not required to address both prongs of the inquiry if defendant makes an insufficient showing as to one. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Even if the evidence is sufficient to convict, the proper remedy for a defendant deprived of effective assistance of counsel is to reverse defendant's conviction and remand for a new trial. *People v. Young*, 306 Ill. App. 3d 350, 356 (1999).

¶ 43 The term "other-crimes evidence" refers to misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which defendant is on trial. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 35. Other-crimes evidence is unquestionably prejudicial to a defendant. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) ("such evidence has 'too much' probative value," rendering a jury inclined to convict defendant not because of its belief in defendant's guilt, but rather on its belief that defendant is a bad person deserving of punishment); *People v. Fletcher*, 335 Ill. App. 3d 447, 449 (2002) ("providing proof of an accused's penchant for criminal behavior would control the decision-making process, resulting in convictions based upon past guilt instead of current evidence").

¶ 44 We note at the outset that as we have already discussed the defendant's charges for possession of a stolen motor vehicle, burglary, and possession of burglary tools above, our current

discussion pertains only to the defendant's convictions for possession of methamphetamine and possession of drug paraphernalia.

¶ 45    As to these charges, the defendant has failed to establish that he was prejudiced by counsel's trial performance. The defendant mainly complains of the references to his criminal history made by officers and Wright's employees in the bodycam footage. However, even if defense counsel had redacted the bodycam footage, as complained of by the defendant, the drug and drug paraphernalia evidence was so overwhelming that we cannot say counsel's actions or inactions influenced the jury to the point that the result would have been different. Therefore, we affirm the defendant's convictions for possession of methamphetamine and possession of drug paraphernalia.

¶ 46    We note that our order today does in fact give the State the opportunity to retry the defendant on those convictions which we are reversing and remanding. However, we find that the trial court does not need to resentence the defendant on the convictions for possession of methamphetamine and possession of drug paraphernalia as the court did a meticulous job in sentencing the defendant on each charge. On April 1, 2020, the court filed a written judgment delineating each of the defendant's convictions and each sentence that accompanied said conviction. Specifically the court's judgment indicated the following:

> "WHEREAS the above-named defendant has been adjudged guilty of the offenses enumerated below.
>
> IT IS THEREFORE ORDERED that the defendant be and hereby is sentenced to confinement in the Illinois Department of Corrections for the term of years and months specified for each offense.

| COUNT | OFFENSE | DATE OF OFFENSE | CITATION | CLASS | SENTENCE | MSR |
|---|---|---|---|---|---|---|
| I | Unlawful Possession of a Stolen Motor Vehicle | 3/31/2018 | 625 ILCS 5/4-103(a)(l) | 2 | 4 yrs. | 2 yrs. |

15

| II | Burglary | 3/31/2018 | 720 ILCS 5/19-l(a) | 2 | 5 yrs. | 2 yrs. |
|---|---|---|---|---|---|---|
| III | Unlawful Possession of Metharnphetamine | 3/31/2018 | 720 ILCS 646/60(a)(2) | 2 | 6 yrs. | 2 yrs. |
| IV | Possession of Burglary Tools | 3/31/2018 | 720 ILCS 5/19-2(a) | 4 | 3 yrs. | 1 yr. |
| V | Unlawful Possession of Drug Paraphernalia | 3/31/2018 | 720 ILCS 600/3.5(a) | A | 364 days County Jail | |

To be served at 50% pursuant to 730 ILCS 5/3-6-3.

To run concurrent with count(s) I, II, III, IV, and V.

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of 209 days as of the date of this order) from 4/1/2018 to 4/19/2018 and 9/24/2019 to 4/1/2020 [Present]. The defendant is also entitled to receive credit for the additional time served in custody from the date of this order until the defendant is received at the Illinois Department of Corrections. The defendant remained in continuous custody from the date of this order.

The Court further finds that the offense was committed as a result of the use of, abuse of, or addiction to alcohol or a controlled substance and recommends the defendant for placement in a substance abuse program (730 ILCS 5/5-4-l(a)).

IT IS FURTHER ORDERED that the sentence(s) imposed on count(s) I, II, III, IV, and V be **consecutive to** the sentence(s) imposed in case number 2018-CF-70 in the Circuit Court of Union County, Illinois." (Bold in original.)

¶ 47 Because of the trial court's very clear record, and demarcation of each offense and its respective sentence, there is no need for resentencing on the remaining two convictions.

¶ 48 III. CONCLUSION

¶ 49 Based on the forgoing, we affirm the defendant's convictions for possession of methamphetamine and possession of drug paraphernalia and reverse the defendant's convictions

for possession of a stolen motor vehicle, burglary, and possession of burglary tools and remand for a new trial on those counts.

¶ 50    Affirmed in part; reversed and remanded in part.